The plaintiff then withdrew his suit. The defendant entered for costs, and moved the Court to assess damages in his favour, and, as such, to allow interest on the judgment below. This was objected to, by the plaintiff's *Counsel*, on the ground, that as the writ of error was not dated, it could not be a *supersedeas*.

THE COURT, by the casting vote of the GOVERNOR, refused to allow the damages, but allowed costs.

## Cornwell *v.* Isham.

### In the Court below,

THOMAS CORNWELL and JOSEPH SHEPHERD, *Appellants;* JOSEPH ISHAM, Executor of *Pierpont Bacon*, deceased, *Appellee.*

The inhabitants of an incorporated society, to whom property is devised, for the support of a school, are competent witnesses to attest the will.

THIS was an appeal from a decree of the Court of Probate, in the district of East-Haddam, establishing the last will and testament of said *Pierpont Bacon.*

The reasons stated by the appellants, in support of their appeal, were, that they were next of kin to the testator; that by said will, he gave $ 30,000 to the inhabitants of the First Society in Colchester, for the purpose of supporting a school in said Society, at such place, near the meeting-house, as said inhabitants should agree upon, for the instruction of youth in reading and writing English, in arithmetic, in mathematics, and the languages, and such other branches of learning as said inhabitants should direct; that after providing for the due management of the property thus given, he directed that the rents and interest should be annually received, and improved, for the support of said school; and that the per-

HARVARD LAW LIBRARY

son, by whom said will was drawn, and the witnesses to the same, were inhabitants of said Society, residing near the meeting-house, possessed of large estates, and having minor children to educate at school.

The executor replied to these reasons, that said Society was large and wealthy, and had sufficient funds for the education of all their youth, in the ordinary branches of science, already provided.

To this replication there was a demurrer. The Superior Court adjudged the replication sufficient, and affirmed the decree of probate.

Error was assigned generally.

*Ingersoll* and *Hosmer* were of counsel for the plaintiffs in error.

The general exception taken to the decree of probate, was, that the witnesses to the will were incompetent, by reason of interest. In support of this general exception, several subordinate propositions were advanced, and enforced by argument.

1. Interest disqualifies, notwithstanding the *public*, as well as private, *object of the bequest*. Education, the object of this bequest, is undoubtedly of public importance ; but why should this constitute an exception to the general rule of testimony, when the question is on the validity of the execution of a will ? Was the will fairly executed, in presence of the persons prescribed by law, to protect the testator from imposition ? The statute makes no exception. The reason of the case makes none. The object is of benefit to the public ; but it is a *corpo-*

*ration interest*, and schools must be maintained, whether the will does, or does not, exist. The idea that a bequest to a corporation for schools, &c. may be proved by a corporator, is suggested in 1 *Gilb.* 252, and *Townsend's case* is cited. The case does not support the citation. In 2 *Sid.* 109. (*a*) the case is reported, and it was a devise to church-wardens, for the benefit of the poor; but the principle contained in *Gilbert* is not authorized by it. Besides, the reason assigned in *Gilbert* shews, that the doctrine is inapplicable here, " *because no man gets, or loses, by the event of the trial.*" It is not so here, where schools must be supported, and, of course, a bequest to support them relieves from taxation. Suppose a devise, to build and repair all the bridges in Colchester, forever; to build and repair their meeting-house; to support their poor; to build and repair their school-houses, and educate their children; to purchase new highways, and repair the old; to support a clergyman: these are all objects important to the public, and interesting to individuals. Every person would be stimulated, by motives of private interest, and of public good, to wish them ardently. Is a person of large property, declining in health, safer in such hands, than with distant relations surrounding him, who become legatees, and parcel out his property?

2. The next proposition in order, is, that the inhabitants of the First Society in Colchester, particularly the witnesses to the will, had an interest in the devise. By interest is not meant, merely something desirable to encrease their happiness,—their enjoyment,—and to heighten their feelings. This the law denominates *influence;* and however much it may sway mankind, it has been thought most eligible to draw the line against *pecuniary*

(*a*) *Anno.* 1653.

**1802.**

CORNWELL
v.
ISHAM.

interest only. Now, by what process of reasoning can it be evinced, that $ 30,000 devised to that corporation, for building and repairing school-houses, and for educating youth, is not a pecuniary interest ? Is it because Colchester is a wealthy society ? But, may not the saving of their wealth, by the support of schools and education of their children, be an interest ? Their school funds may be augmented, or may be spared to other purposes. A school of a higher order may be established. If the corporation of Colchester should have a superfluity of wealth, undoubtedly the legislature would permit the application of the Western Reserve fund to other than school-purposes. Finally, the bequest would be singularly useful, if the western drain should be choked up ; if our monies should evaporate, and our bonds be worse than white paper.

It may be objected, that there is nothing *to bring to market*. But, is that the criterion ? Suppose a fund is constituted to pay the pastor's salary ;—is there no interest, because there is nothing to bring to market ?

3. The interest was not trifling, remote, or contingent. First, as to its being trifling. If such were the fact, it would not avail.(*b*) The idea, that it would avail, cannot be supported. *Townsend's case*, in 1658, and some others about the same time, probably went on that idea. But, since the statute of frauds, no such determinations have been made, unless in conformity to particular statutes. Thus, for penalties not exceeding 20*l.* going to the parish, by *Stat.* 27 *Geo.* 3. *c.* 29, parishioners may be witnesses to prove the offence. By *Stat.* 1 *Ann. c.* 18, the inhabitants of a county are permitted to testify, though *by common law prohibited*, on indictments

(*b*) 3 *Woodeson* 290.

against the county, for not repairing bridges and highways. So, by *Stat.* 8 *Geo.* 2. *c.* 16, the inhabitants of a hundred, when sued on the statute of *Winton*, may testify. So, by *Stat.* 3 *and* 4 *W.* 3. *c.* 11, in actions against church-wardens, for money mispent, the inhabitants of the parish, other than such as take alms, may be admitted. (*c*)   But, in all these instances, though the interest may be ever so trivial, nothing short of a legislative act could admit the witnesses.   The cases in *Espinasse's Digest* p. 715, are all of that class, where there was *no interest at all*, except in the one of the *Steward*, who was admitted from the necessity of the case.

But in point of *fact*, how trifling is the interest? The amount of property concerned is $ 30,000, the annual interest of which is $ 1,800, very unlike a trifle !

In the next place, as to the remoteness and contingency of the interest.   The witnesses were not mere trustees ; they were *cestuy que trusts ;* they were devisees, —parties to the devise.   The interest, in this case, is no more remote, than any other interest under a will is. Because it is not tangible, by the witnesses ; because the Society are trustees, and manage with it, as with corporation property, is it, therefore, *remote ?* It is no more remote than the Western Reserve property.   Is it *contingent ?* Not more so, than any other interest under a will.   When the testator dies, it is *vested.* The fee of the property is in the corporation.   How much benefit each man shall receive, is contingent.   That depends upon his life, the number of years he shall remain in Colchester, the number of his children, the value of his property exempted from taxation.   But, as to the witnesses to the will, so soon as the testator died, they had

(c) *Esp. Dig.* 712. *Dub. Edit.* 1794.

1802.

CORNWELL
v.
ISHAM.

a portion of the fee in them, as members of the corpora-tion. They were inhabitants of Colchester, men of wealth, having numerous offspring; and the contingency was the same, as if, this day, $ 30,000 should be deliver-ed to the witnesses, for the support of the ministry in Colchester. Whether they would live long enough to enjoy the donation, is contingent; but the interest is ves-ted, and every part of their real estate is benefited by it.

The legal idea, annexed to the expression " contingen-cy," which shall admit a witness, is, where it is wholly uncertain whether he has any interest. Such is the case of an *heir apparent*; such the case of *creditors*. Both are remote possibilities; but no interest, through the mist of contingency, is discernible. But the case of a remain-der man in tail, after the expiration of an estate tail, will illustrate the idea. He may not be admitted a witness to support a devise, under which he claims; " for he hath an estate, such as it is." (*d*) Thus, in case of an estate to A. for life, remainder to his eldest son then living, in tail male general, who has ten sons, remainder to B.—B. may not testify. Yet he has *an interest, such as it is;* ninety nine chances to one against him.

Possibilities of a certain class, much more contingent than this interest, are devisable, descendible, and grant-able. In the cases of *Selwin* v. *Selwin*, (*e*) *Gurnel* v. *Wood*, (*f*) *Marks* v. *Marks*, (*g*) *Goodright* v. *Searl* (*h*) and *Pinbury* v. *Elkin*, (*i*) there is a possibility only; but surely the Court would not, on that ground, say, that the remainder man might be a witness to the will.

(*d*) 1 *Salk.* 283, *Smith* v. *Sir R. Blackham.*
(*e*) 1 *Bla. Rep.* 222.              (*f*) *Cited in* 1 *Bla. Rep.* 225.
(*g*) 1 *Stra.* 129.                  (*h*) 2 *Wils.* 29.
(*i*) 1 *P. Wms.* 564.

The true principle is mentioned, by Lord CAMDEN, in *Doe* d. *Hindson* v. *Kersey.* (*j*) " It is impossible to " say what degree of interest will have *no influence* on

1802.

CORNWELL
*v.*
ISHAM

(*j*) The case of DOE *on the demise of* HINDSON, *et ux. et al. v.* KERSEY was decided in the Court of Common Pleas, in 1765. Lord CAMDEN dissented to the judgment of the Court, and supported his opinion, by an argument, which, in legal skill, and judicial eloquence, has, perhaps, never been surpassed. This argument, which is not contained in any book of Reports, was published in quarto, in 1766 ; but, at this time, the printed copies are, in England, extremely scarce ; in America, there are none. By the great research, and the kindness, of a professional gentleman, to whom I am indebted for many other communications, I have been furnished with a manuscript copy, with permission to publish it, for the benefit of the profession.

THIS was a special case, upon an ejectment of one messuage, twenty acres of meadow, and twenty acres of pasture, with the appurtenances, in Maulsmeabourn, in the Parish of Crosby Ravensworth, in the County of Westmoreland. It was tried at Applebee Summer Assizes, 1760, before Mr. Justice BATHURST.

*John Knott*, being seized in fee simple of a messuage, and other tenements, made his will in writing, on the 16th of August,1734, in the words and figures following, that is to say :

" In the Name of GOD, Amen. I *John Knott*, of Maulsmeaburn, in the Parish of Crosby Ravensworth, and County of Westmoreland, yeoman, being of good health in body, and of a disposing mind and memory, make this my last will and testament, as followeth, hereby revoking all former wills by me made. As to my temporal estate, which GOD in mercy hath lent me, if by his Providence, it is continued to me to the end of this my temporal life, without a necessity of selling or incumbering it, and that I have no issue, then, by GOD's permission, I dispose of it as follows : I give and devise unto *Isabel*, my dear wife, my whole estate of lands, to have and to hold during her natural life, but with this proviso, that, in case there be occasion to raise money for the payment of my just debts, after sale made of what she can spare, I do hereby give unto her, my said wife, as good and full power and lawful authority, as I myself now have, to sell and convey my eleven grasses, or cattle gates, in the

G

" the minds of the witnesses.   It is better, therefore,
" that the rule should be inflexible, than that it should
" bend with the discretion of the judge."

Lordship's pasture, commonly called Cow Close, and Ox Close, viz.
six whole gates, and two ancient half gates, belonging to the estate
I purchased of *Oliver Whitehead*, and four gates I purchased of
*Thomas Barrow. Item*, after the decease of my wife, I give and
devise my dwelling house, erected upon the green in Maulsmeaburn,
and the barn and byar I purchased of *Thomas Barrow*, and all the
lands now in my possession, which I bought of the said *Barrow*, by
what name or names soever called, from Meaburn Green at the East
end, to Wickerslack Field at the West end, and adjoining to the
grounds of *William Garnett* on the North side, (save that the Garth
adjoins to *William Thwayter's*, and the Ing Croft to *Margaret Dar-
by's* lands) and to the ground of the said *William Garnett* and *John
Knott* on the South side, to have and to hold the said lands and houses
to my trustees, herein after named, (whom I humbly desire to ac-
cept the said trust) and to their successors forever, viz. *John White*
of Maulsmeaburn, my brother-in-law, *Christopher Dent* of Frainland,
*Robert Burra* of Dryevers, and *William Burra* of Maulsmeaburn,
and they the said feoffees in trust, and their successors forever, are
desired, and hereby humbly required to lett or sett the said houses
and lands, and yearly dispose of the rents and profits thereof, at
Martinmas and Whitsuntide, in every year after my said wife's de-
cease, as hereafter desired and directed, and to no other uses or pur-
poses whatsoever ; namely, I desire and require my said trustees,
with all possible piety, to dispose of the yearly profits, as aforesaid,
to such poor people within the Lordship of Maulsmeaburn (being le-
gally settled therein) as I now name, that is to say, indigent orphans,
under ten years of age, (which are yet unable to labour,) to poor aged
people, (which are utterly past labour) to poor impotent people, which
are lame or blind, (which cannot labour) and to put out the children of
such poor people as above, either sons or daughters, apprentices, as
soon as they are fit for it ; but, by no means, to encourage any idle per-
sons, that are able to labour ; and I desire my said trustees and their
successors, to meet every half year, to make a distribution of the profits
arising from the said estate ; and when it pleases GOD, that any of
them depart this life, I desire their survivors, at their first meeting,
to nominate the fittest persons in Maulsmeaburn Lordship, and never
any out of it, to execute this trust ; and I desire my trustees, at
their half yearly meetings, to take a moderate refreshment out of the

4. There has been no settled practice to admit the inhabitants of a town or society to testify, in cases, in which the property of the corporation is concerned, or to which the corporation is a party.

profits of the said estate, not exceeding four pence a man; and I most humbly beg, that in case any difference, or neglect, should happen, in future times, amongst my trustees, that the Honourable *Robert Lowther*, Esq. his heirs, and successors, at Maulsmeaburn Hall, will be pleased to inspect this affair, and examine if a due distribution has been made herein, and if otherwise, to make due regulations, according to this my desire and design; and it is my will and desire, that my trustees require such of the poor, as receive any of this charity, as are of ability to go to the church every Sunday, or as often as they are able, and the weather good; and I do desire and require my said trustees to pay five shillings yearly, and every year, to a proper person, that will keep the dogs out of Crosby Ravensworth Church, every Sunday, during divine service and sermon; and I do desire and require my trustees to pay yearly, and every year, five pounds to the master of the Free School in Crosby Ravensworth; and I further desire and require my said trustees, to take care, that the houses and fences, belonging to the above devised premises, be kept in good repair. *Item*, after the decease of my wife, it is my will, and I hereby give and devise to my true and faithful servant, *Ann Gibson*, if she survive my wife, the house, (now a stable) barn and byar, Garth, Ing Croft, Ing Croft Bottom, Croft Head, and Mainis Close, which I purchased of *Oliver Whitehead*, the East end opening to the street, in Maulsmeaburn, and the West end adjoining to the ground of *John Parkin*, and on the North side adjoining to the ground of the Honourable *Robert Lowther*, Esq. and on the South side to the ground of *William Sheppard*, senior, to have and to hold to the said *Ann Gibson*, during her natural life, or till the day of her marriage, and no longer; for this devise shall utterly cease and be void. *Item*, after the said *Ann Gibson's* decease, or marriage, I do hereby will, devise, and give unto my sister, *Mary Brown*, all the said house and croft in full, as above mentioned, which I purchased of *Oliver Whitehead*, to have and to hold to my sister, *Mary Brown*, during her natural life. *Item*, after the decease of my said sister, *Mary*, I do hereby will, devise, and give unto *Ann Kebson*, my niece, daughter to my said sister, *Mary Brown*, all the said house and croft in full, as above mentioned, (to *Ann Gibson*) and which I purchased of *Oliver Whitehead*, to have and to hold unto the said *Ann Kebson*, and her

In the *English* practice, *Townsend's case* is almost the only instance, in which corporators have been permitted to testify, where the interest of the corporation was con-

heirs forever. *Item,* I do hereby will, constitute and appoint my dear and loving wife, *Isabel,* executrix of this my last will and testament. *Item,* I do hereby will, order, and appoint my executrix, to pay to *Ann Gibson,* my servant, twenty shillings, yearly, and every year, during their joint lives, or till the day of *Ann Gibson's* marriage, upon which said marriage day, this legacy is utterly to cease, and be no more, or longer, paid. *John Knott's* will, wrote by his own hand, on two half sheets of paper, the first written on both sides, and a part in the margin, dated 16th day of August, 1734."

The lessors of the plaintiff claimed title to the said messuage and tenements, in right of *Agnes,* wife of the lessor, *Samuel Hindson, Mary,* wife of the lessor, *Thomas Langhorn,* and *Elizabeth,* wife of the lessor, *Thomas Cowper,* as being cousins and coheirs of the said testator, *John Knott.*

The said defendant, *Elizabeth Kersey,* claimed under the said *Ann Gibson,* who, she (*Kersey*) insisted, was entitled, during her (*Gibson's*) life, or till her day of marriage, to the said messuage and tenement, under the will of the said testator, *John Knott.*

On the trial of this ejectment, it appeared, in the course of the evidence, " That the said *John Knott* afterwards, to wit, on the 19th day of October, 1746, at Maulsmeaburn, in the said County of Westmoreland, died, seized of the said messuage and other tenements, as aforesaid ; and, that the said paper writing was signed, sealed, and published, by the said *John Knott,* in the presence of the said *Henry Holme, Robert Burra,* and *John Mitchell,* whose names were subscribed thereunto in the presence of the said *John Knott,* the testator ; and it also appeared, that the said *Isabel,* the wife of the said *John Knott,* died, on or about the 24th day of December, in the year 1756, and that, on her decease, the said *Ann Gibson* entered upon the house, lands, and other premises, devised to her, by the said will ; and, that she is now living, and unmarried ; and, that the said *Henry Holme* and *Robert Burra* were two of the devisees in the said will, upon the trusts therein mentioned, and were two of the three persons, who attested the execution of the said paper writing, purporting to be the will of the said *John Knott ;* and, that the said *Hen-*

cerned. That probably was on a principle antiently practised on, that where the interest was *very small*, the testimony of the interested person might be admitted.

*ry Holme* and *Robert Burra*, at the time of the publishing and attesting of the said paper writing, and the said *Henry Holme, Robert Burra,* and *John Mitchell,* at the time of the decease of the said *John Knott,* the testator, and at the time of their attesting the said paper writing, and continually from that time, and long after the decease of the said testator, were, respectively, seized in fee-simple of divers messuages, lands, and hereditaments, lying within the said Lordship and Township of Maulsmeaburn aforesaid, and that, during the whole time aforesaid, they, severally, were possessed of, and occupied the same, and inhabited within the said Lordship and Township, which was, and is, a large district, and from time immemorial contained a great number of inhabitants, and lay within the Parish of Crosby Ravensworth aforesaid, and maintained their own poor, separate, and apart, from the Parish of Crosby Ravensworth ; and, that they, severally, for all the time aforesaid, were chargeable and taxable ; and were actually assessed, taxed, and paid towards the poor, and unto all other, the taxes of the said Lordship and Township of Maulsmeaburn aforesaid ; and it appeared, that before the time of the said trial, the said *Henry Holme,* and *Robert Burra,* had, respectively, released all their interest under the said paper writing, purporting to be the will of the said *John Knott,* to the other trustees therein named ; and also, that the said *Henry Holme, Robert Burra,* and *John Mitchell,* had, severally, conveyed away, and disposed of, all their respective estates and interests in their said messuages, lands, and hereditaments, lying within the said Lordship and Township, before the time of the said trial. It also appeared, that the said paper writing was signed by the said *John Knott,* before the making of the statute of the 9 *Geo.* 2. *c.* 36. intituled, " An Act to restrain the disposition of lands, whereby the same become unalienable ;" but the said *John Knott* lived till long after the 24th day of June, 1736, being the day from which the said statute was appointed to take effect :" Whereupon a verdict was given for the plaintiff, subject to the opinion of the Court of Common Pleas ; and the question, reserved for the consideration of the Court, was,

" Whether, under the circumstances of this case, the said paper writing, purporting to be the will of the said *John Knott,* was sufficient, and effectual, to pass the said messuage, lands, and tenements

But that idea has been exploded for more than a hundred years. The next case worthy of attention is the *water-bailage case*, (*k*) in which the question was, whether the

(*k*) *Anno* 1682.

of the said *John Knott*, unto the said *Ann Gibson*, (who survived the testator's wife) during her life, or until the day of her marriage ; and, if the Court should be of opinion with the lessors of the plaintiff, they are to be at liberty to sign judgment, and take out execution thereon, with costs ; but if the Court should be of opinion with the defendant, then the lessors of the plaintiff are to pay costs, as of a nonsuit.

Lord CAMDEN (*a*) delivered his opinion to the following effect.

Two questions arise out of this will :

1. Whether it is executed according to the statute of frauds ? (*b*)

2. If not, Whether the objection to it is cured by the late act ? (*c*)

The particular question under the statute of frauds, is,

Whether the witnesses are *credible ?*

To clear which, the following points must be taken into consideration :

1. Who are those witnesses, described in the act, by the word " *credible ?*"

2. Whether the witnesses here come within that description ?

3. Whether this non-credibility can be purged, by any matter *ex post facto*, so as to establish the will ?

4. Whether allowing they cannot be admitted to prove their own

(*a*) *His Lordship's title, then, was only* " The Right Honourable Sir CHARLES PRAT, Knight."
(*b*) 29 Car. 2. c. 3. *perpetuated by* 1 Jac. 2. c. 17. s. 5.
(*c*) 25 G. 2. c. 6.

city of *London* had right to a certain duty for goods im-
ported. Freemen of the city were offered as witnesses.
The reporters differ, as to the decision of this case in the

legacies, they may be let in to the other devises, wherein they have
no interest ?

Upon some of these questions I shall be obliged to differ with the
opinion of the Court of King's Bench, delivered by Lord MANSFIELD,
in the case of *Wyndham* v. *Chetwynd,* or rather, (for so I wish to put
it,) I shall agree with the judgment of the same court, (*d*) delivered
by Lord Chief Justice LEE ; for, as both the opinions are justified
by authorities of equal weight, a man may take either side, without
hazarding his reputation.—*Magno se judice quisque tuetur.*—I had
rather have it said, that I concur with one great judge, than that I
dissent from another.

The course I shall pursue is this :

1st. I shall endeavour to give you the scope of Lord MANSFIELD's
argument, as I understand it.

2d. Then I shall lay down the method, in which I shall treat the
subject ; and, while I am establishing my own propositions, I will en-
deavour to answer the argument on the other side, as it falls in my
way.

His *Lordship's* method of arguing, as far as I am able to collect it, I
take to be this :

He first affirms, that this attestation of three witnesses is mere
form, in which light the judges should always endeavour to get over
the objection, in favour of wills. And many instances to this purpose
are cited, shewing how liberally they have dealt with the statute,
where the objection was formal only.

Then, with respect to the clause itself, he insists, that this is not
a question of construction upon any words of the statute ; for that
no stress ought to be laid upon the word " credible," which is either
misapplied, on nugatory, as included in the word " witness."

(*d*) *That opinion was delivered on Tuesday, 22d April,* 1746, *Easter
Term,* 19 G. 2. 1 Bur. Rep. 425. 2 Stra. 1253.

1802.

CORNWELL
*v.*
ISHAM.

Court of King's Bench. In 1 *Vent.* 351, it is said, that the witnesses were admitted, a bill of exceptions was filed, and afterwards their testimony was *waived.* In

That the whole clause, indeed, is ill penned, and inaccurate, and the world under a great mistake, in thinking it was drawn by Lord HALE, in which respect, *a judge may take greater liberties with it, than he otherwise could do.*

That the legislature could not seriously mean to prevent frauds, by this direction ; for, though it might be some guard, in theory, it was hardly any, in practice : They only meant to make the execution something more formal than it was before.

That the statute being deprived of the word " credible," the other word " witness" was to be expounded by common law analogy.

From whence this rule was taken, that, as at common law, no man was allowed to be a witness, to prove an interest for himself ; so, since the statute, no man shall, by his own subscription, take an interest, which he could not prove, at the time, by his own examination.

That the case of *Hilliard,* v. *Jennings* (e) goes no farther.

From the rule they framed, his *Lordship* is pleased to conclude, not only,

That a release, or payment, will re-establish the witness, if his incompetency really stands in the way ; but still further,

That such a witness may, even without a release, be competent enough to prove the will, for every person, except himself.

In opposition to this reasoning, I propose to maintain,

1. That this *credibility,* which I shall prove to be *competency,* is a necessary and substantial qualification of the witness, " at the time of attestation."

2. That if the witness is incompetent at that time, he cannot purge himself afterwards, either by release, or payment, so as to set up the will.

(e) *Reported in* 1 Ld. Raym. 505. Com. Rep. 92. Carth. 514.

2 *Show.* 148, it is reported, that the witnesses were not admitted, and that a bill of exceptions was filed. In *Colfield* v. *Wilson,* (*l*) decided two years after the *water-*

(*l*) 1 *Vern.* 254.

3. That he cannot be a witness, in that case, to establish any part of the will, but that the whole is void forever.

As my brothers differ with me, upon the second question, by holding that the witnesses are competent by the rule of law, I might, if I thought it fitting, leave all the other points undiscussed, as not absolutely necessary to the decision of this case ; and I should have been glad, for several reasons, to have done it, if other reasons, more weighty with me, had not determined me the other way.

One is, that as the whole argument is connected by a chain, those parts, whereon I am bound to speak, could not be so clearly illustrated, nor would they, as I apprehend, be urged with half the force, if the others were omitted ; for they do all throw light upon each other, and the former are proper and material introductions to the latter.

Another is, that as the same case may again exist, and even this case may yet come before another court, and likewise, as no cases of the like kind, in my opinion, are cured by the late act, (*f*) but that future wills, as well as those that are past, under such like attestations, must occasion the same questions, when they happen to be contested ; I think myself bound in duty to declare my dissent to the last opinion of Lord MANSFIELD, and do my best endeavours to restore Lord Chief Justice LEE's, which has been so considerably shaken, I may say, over-turned, because the last opinion, (*g*) if it is acquiesced under, almost always governs, and becomes the leading case.

So that if I should now decline this argument, my silence would be construed into an assent to Lord MANSFIELD's doctrine, which I am clearly satisfied is erroneous.

These reasons, no doubt, prevailed upon his Lordship to declare himself against Lord Chief Justice LEE, in a case where, according

(*f*) 25 *G.* 2. *c.* 6.
(*g*) *Judicia posteriora sunt in lege fortiora.* 8 Co. 97.

**H**

*bailage case*, Lord Keeper NORTH agrees with *Shower.* In 1694, Lord SOMERS declares, " that the cases where " the party was concerned in interest, though never so

to his own opinion, he might have avoided the question, and yet have pronounced the same judgment ; but he thought it more manly to meet a principle, in open combat, which he thought wrong, than to give further strength to that error by avoiding the contest.

I have hitherto treated the argument I am answering, and I am obliged to treat it throughout, as Lord MANSFIELD's argument, and not the argument of the court, because his *Lordship* has told us it is his own, and he is personally answerable for all its errors ; as for the opinion of the court, he only tells us, in general, they held the will duly executed, according to the statute, but has not informed us upon what grounds that resolution was framed ; so that I am not able to say whether the *puisne Judges* (*h*) agree with his *Lordship* in all his three grounds, or if not in all, in which of those three ; nor do I think it right now to enquire, because the practice of explaining a publick resolution, in private, by parol, might be attended with some bad consequences.

I must, therefore, bespeak your patience, for I am afraid I shall be very tedious ; if I should, it must be imputed to the high respect I bear to that great person with whom I differ, as it would be an unpardonable neglect to pass over, or disregard, even a single word, that he has thought material.

I am very sensible, that I am destroying an honest will, upon a nominal objection ; for the interest here, which I must treat as a serious incapacity, is too slight, even to disparage the witness's credit, if he could be sworn ; and yet I must adjudge him, upon this objection, to be a person so destitute of all credit, that he is not fit even to be examined ; but as it is not my business to decide cases, by my own rule of justice, (*i*) but to declare the law as I find it laid down, if the statute of frauds has enjoined this determination, it is not my opinion, but the judgment of the legislature.

As I am satisfied, however, that this will was fairly executed, I

(*h*) WRIGHT, DENISON, and FOSTER. 2 Str. 1253.
(*i*) *Judex bonus nihil ex arbitrio suo faciat, nec proposito domesticæ voluntatis, sed juxta leges ac jura pronunciet.* 7 Co. 27. *Calvin's case.*

" small, have always prevailed, and so it was resolved, " upon great debate in the case of the city of London " concerning the water bailiff."  In *Dodswell* v. *Nott*, (*m*)

1802.

CORNWELL
*v.*
ISHAM.

(*m*) 2 *Vern.* 317, *anno* 1694.

am very glad my brothers, by differing with me, have enabled me to give judgment in favor of it, against my own opinion.

Before I proceed, I desire it may be understood, that I do, by no means, deny the authority of the judgment in *Wyndham,* v. *Chetwynd;* for that case was not determined only upon the general principles, which I am obliged, in this argument, to deny, but upon it's own general as well as particular circumstances, none of which can be applied to the case of a mere legatee witness.

The first general question, then, or rather enquiry, being this, who are those witnesses, which are described in the act, by the word " credible" ?

I answer, in one word, they are *competent* witnesses, and no other.

And when it is further asked, at what time must the witness be indued with this qualification ?

I say, that he must be clothed with it, *at the time of attestation.*

This, then, is the proposition that I mean to maintain :

That the witness's credibility, (which I shall prove to be competency) is a necessary and substantial qualification, at the time of attesting.

To establish this, it will be incumbent on me to prove, that the legislature set up these witnesses as a guard, to protect the testator from fraud, in that critical minute, when he was about to execute his will ; which I will do from the spirit, as well as the words of the statute ; and shall then confirm my construction by the authority of *Hilliard* v. *Jennings,* which is a case in point upon this question.

In the out-set, I beg leave to make one observation, which I desire may be attended to, because it should be carefully kept in view, throughout the whole argument ; and it is this :

Lord SOMERS decided, that when the dispute was touching the loss of money given to the parishioners, no inhabitant of the parish should be admitted a witness.

That there is a great difference between the method of _proving_ a fact, in a court of justice, and the _attestation_ of that fact, at the time it happens. These two things, I suspect, have been confounded ; whereas it ought always to be remembered, that the great inquiry upon this question is, how the will ought to be _attested_, and not how it ought to be _proved._

The new thing introduced by this statute ($j$) is the attestation ; the method of proving this attestation stands as it did upon the old common law principles.

Thus, for instance, one witness is sufficient to prove what all the three have attested ; and though that witness must be a subscriber, yet that is owing to the general common law rule, that where a witness has subscribed an instrument, he must be always produced, because it is the best evidence. This we see in common experience ; for after the first witness has been examined, the will is always read ; and in the case of _Hilliard_ v. _Jennings,_ you will find that the objection was not to the want of due proof in court, but whether the devisee was a _credible witness_ within the meaning of the statute ?

This, I am afraid, has not always been attended to ; but some persons have been apt to reason upon this point, as if the statute had directed the will to be _proved_, by three credible witnesses, forgetting the difference between the _subscription_, and the _proof_ of that subscription.

I proceed, now, to shew, that the witnesses must be credible, at the time of attestation, within the true intent and meaning of the act.

This clause has introduced a new ceremony to be observed in the publication of wills. This act of publication is to be done before three credible witnesses. This I call the _substance_ ; because these are the acts to be done by the parties. When this is done by the testator, and has been seen, and heard, by the witnesses ; then,

The testator is to sign, and the witnesses are to subscribe, in the presence of the testator. This is the _form._

($j$) 29 Car. 2. c. 3. _perpetuated by_ 1 Jac. 2. c. 17. s. 5.

From this time the *quantum* of interest has been holden to be immaterial. If interested at all, the witness shall not be admitted. In *Brown* v. *Corporation of London,* (*n*)

(*n*) 11 *Mod.* 225, *anno* 1710.

The difference is apparent; for the signing and subscription in the presence of the testator, is only the *mode of recording the act,* by committing it to writing, at that time; and though the formal, as well as the substantial part, are equally essential to the perfection of the will, yet judges may fairly be more liberal with the form, than they can with the substance.

Now, if the question be asked, whether the quality of credibility is requisite in the witness, at the *time of attestation?* I answer, nothing can be more clear, upon the words, if credibility means any thing; for what is the clause but a description of those solemnities, that are to attend the execution, among which the presence of credible witnesses is made necessary? It is admitted, that if any other description had been added to the witnesses, that must have belonged to them at the time; as if three Englishmen, or three full aged persons, had been required, these adjuncts would have been necessary at the time; and if so, I see not, by what rule of construction, one epithet or adjunct can be distinguished from another.

Nay, if the word credible be expunged, and the word *witness,* as it is admitted, does, *ex vi termini,* include *competent,* still competency must be essential to the witness, at the time of execution. So, *quâcunque viâ data,* an interested witness cannot be the witness the law intends to be present at the execution.

But this, it may be said, is cavilling upon words, and an artifice to evade the true question, which turns upon the spirit and intention of the law; for, if the solemnity was not really introduced to *protect the testator from fraud,* but only to add a little more form to will-making, the court ought to attend more to the *number,* than the *quality,* of the witnesses; and the law will be satisfied, if they are made credible at the trial.

Now, although this construction will be a manifest violence upon the words, yet I will meet the argument fairly, upon the great ground, and maintain my opinion, upon the very spirit and intention of the act.

1802.

CORNWELL
*v.*
ISHAM.

on a question respecting prescription for toll, HOLT, Ch. J. would not permit a corporator, *irregularly disfranchised*, to be a witness. In *Attorney-General* v. *Wy-*

I say then, that the legislature ordained, and meant to ordain, the three witnesses *to be a guard to the testator against fraud, at the time of executing the will;* and, that the witnesses are called in, not only to *attest,* but to *protect.*

This is the true state of the question between us. Say the other side, credible signifies nothing ; the whole business is mere form ; so little has the statute to do with this point, that the question is not a question of construction upon any words of it.

I must, on the contrary, maintain it to be a question of construction. To say the truth, the point must, either way, turn upon the construction. If the statute determines the question, it is simply a question of construction ; and if it is to be laid aside, you must still construe the statute, to get rid of it. But to proceed,

Before the statute of frauds, any scrap of writing, though it was neither signed, sealed, nor written by the testator, might have been established, by the testimony of one single witness ; nay, though this person was legatee, if he released, he was a good witness.

This did, in fact, happen in a very remarkable case, that of *Sir Francis Worseley's will.* (*k*)

One *Baynham,* of Gray's Inn, wrote a will for *Sir Francis Worseley,* which will was in loose sheets, dictated, as *Baynham* said, by *Sir Francis,* who had neither signed nor sealed the same, though the writing itself purported both ; but *Sir Francis,* who intended to write the same over again himself, said, that, in the mean time, that should be his will. *Baynham* was the only witness to all this transaction, and he was a trustee, a legatee, and an annuitant under the same will. An objection was taken to *Baynham's* testimony, as a legatee, whereupon they shewed a release, and proved that he had received the money.

(*k*) *This case is reported in* Sid. 315. pl. 33. 2 Keb. Rep. 128. pl. 82. *by the name of* Stephens, Lessee of Gerard, *v.* Lord Manchester, 18 Car. 2.

*burgh*, (*o*) Lord PARKER decided, that "parishioners
"were not good witnesses to prove a charity given to
"the parish." In *Burton* v. *Hinde*, (*p*) decided as late

1802.

———

CORNWELL
*v.*
ISHAM.

(*o*) 1 *P. Wms.* 600.      (*p*) 5 *Term Rep.* 174.

And yet, says *Keble*, the court conceived this a sufficient will, and
the jury found it so, and verdict for defendant, lessee of his bastard,
against the true heir at law, lessor of the plaintiff.

This determination was clearly legal, at that time ; yet the reporter
thought, (as every other person, that reads it, must) that it was a
case of great hardship, to disinherit the heir, by a will so made, and
so attested, the same person being drawer, legatee, and witness.

The two great and alarming considerations upon this case were
these : that such an unfinished paper should be deemed a will ; and
that one person, so interested, should be the only witness.

All the world must see, as soon as this case was determined, that
testators would be delivered up to the practices of crafty and design-
ing men, if such wills, and such witnesses, were suffered to prevail
any longer. The testimony was rather worse than the will ; unless
any man can think, that a wicked will becomes honest, by the wit-
ness's sealing a release, when that very release that lets in his evi-
dence, establishes the fraud.

Whether this case was, in truth, the occasion of the will clause
in the statute of frauds, as some have thought, I do not know ; but
when you reflect that this case happened in 18 *Car.* 2. the law made
but eleven years after, which is no great length of time to prepare,
digest, and finish this noble law, which deserves to be called a *code,*
rather than a single Act of Parliament ; and when it is found, by the
provision of this new law, that, for the future, the will is to be a
perfect instrument, signed by the testator, and that three credible
witnesses, at the least, are introduced, to be present at the transac-
tion, pointing directly at the two grievances in *Sir Francis Worseley's
case*, and going no further ; the provision is so remarkably adapted to
meet with that case, that I cannot be brought to believe, it was
either neglected or forgot. However that may be, I am at least sure,
that this was a most material case, to shew the necessity of this pro-
vision.

**1802.**

**CORNWELL**
*v.*
**ISHAM.**

as in 1793, in trespass *quare clausum fregit*, the defend-
ant justified under a right of common ; the plaintiff
claimed under a corporation, to which a rent from the

The clause of the statute is made in the following words :

" All devises and bequests of any lands or tenements shall be in
" writing, and signed by the party so devising the same, or by some
" other person in his presence, and by his express directions, and
" shall be attested and subscribed in the presence of the devisor, by
" three or four credible witnesses, or else they shall be utterly void,
" and of none effect." *Stat.* 29 *Car.* 2. *c.* 3. *s.* 5.

Now, that the statute had a main view to the quality of the wit-
ness, will appear from this consideration, viz. That a will is the only
instrument in it required to be attested, by subscribing witnesses,
at the time of the execution. It was enough for leases, and all other
conveyances, marriage agreements, declarations, and assignments
of trust, to be in writing.

These were all transactions of health, and protected by valuable
considerations, and antecedent treaties. The power of a court of
equity was fully sufficient to meet with every fraud, that could be
practised in these cases, after the contract was reduced into writing

But a will was a voluntary disposition, the arbitrary, capricious
pleasure of the testator, executed suddenly, in the last sickness, al-
most *in articulo mortis.*

If the man is sane, his will must be established. Cruelty, ingrati-
tude, unnatural preferences, or exclusions, are no objections to such a
will. *Stat pro ratione volantas.* Was the testator in his senses, when
he made it ? is the only question, that can be asked ; and, conse-
quently, the time of the execution is the critical minute, that requires
guard and protection.

Here, you see the reason, why witnesses are called in, so em-
phatically.

What fraud are they to prevent ?

EVEN THAT FRAUD, SO COMMONLY PRACTISED UPON DYING

common was reserved ; and the issue being on the sufficiency of common, freemen of that corporation were called as witnesses for the plaintiff ; but they being objected

MEN, WHOSE HANDS HAVE SURVIVED THEIR HEADS ; WHO HAVE STILL STRENGTH ENOUGH TO WRITE A NAME, OR MAKE A MARK, THOUGH THE CAPACITY OF DISPOSING IS DEAD. WHAT IS THE CONDITION OF SUCH AN OBJECT, IN THE POWER OF A FEW, WHO ARE SUFFERED TO ATTEND HIM, WHEEDLED, OR TEIZED, INTO SUBMISSION, FOR THE SAKE OF A LITTLE EASE ; PUT TO THE LABORIOUS TASK OF RECOLLECTING THE FULL STATE OF ALL HIS AFFAIRS, AND TO WEIGH THE JUST MERITS, AND DEMERITS, OF THOSE, WHO BELONG TO HIM, BY REMEMBERING ALL, AND FORGETTING NONE !

Such an act, to be done at such a time, is so pregnant with suspicion, that a formal declaration of the testator's sound and disposing mind and memory, though he is weak in body, is grown to be a common introductory clause to almost every testament.

Who, then, shall secure the testator, in this important moment, from imposition ? Who shall protect the heir at law, and give the world a satisfactory evidence that he was sane ?

The statute says " three credible witnesses." What is their employment ? I say, to inspect and judge of the testator's sanity, before they attest. If he is not capable, the witnesses ought to remonstrate, and refuse their attestation.

They are infamous, if they do not. In all other cases, the witnesses are passive ; here they are active, and, in truth, the principal parties to the transaction. The testator is intrusted to their care.

Sanity is the great fact the witness is to speak to, when he comes to prove the attestation ; and that is the true reason, why a will can never be proved, as an exhibit, *vivâ voce*, in chancery, though a deed may ; for there must be liberty to cross-examine to this fact of sanity. From the same consideration, it is become the invariable practice of that court never to establish a will, unless all the witnesses are examined ; because the heir has a right to proof of sanity, from every one of them, whom the statute has placed about his ancestor.

I

to, on the ground of interest, the Court said the objection must prevail, however small might be the interest in reality.

This practice, which is coeval with the statute, is a strong argument to shew, that the Parliament called in the witnesses to prevent insane diposition ; and that their business, therefore, is not barely to attest, but to *try*, *judge*, and *determine*, whether the testator is *compos* to sign and publish.

And yet, this duty of the witness, this solemn trial of the testator's sanity, has been called a matter of form, and of no use to prevent frauds.

I am of a very contrary opinion. It is not a very easy thing to procure three disinterested witnesses to attest the will of a *non compos*. That many fraudulent wills have been made, since the statute, and all formally executed, I have no doubt ; and I am afraid these frauds will continue to the end of time ; for what law can totally extinguish wickedness, and reform mankind ? But, if a law is to be slighted, because it does not entirely eradicate the mischief it was made to prevent, no law whatever can escape censure. Many bad wills have been made ; but, who can tell me how many have been prevented ?

The design of this statute was to prevent wills that ought not to be made, and always operates silently, by intestacy. I have no doubt, (for this assertion cannot be proved) but that a thousand estates have been saved, by this excellent provision. It is called *a guard in theory only ;* whereas almost every delirious paralytic, that is suffered to die intestate, is preserved by this law, and gives testimony of its utility.

But if you once treat this part of the solemnity as a form, and call the *devisees* and *legatees* into the sick man's chamber, the whole ceremony will then, I admit, become a mere form ; nay, it will be worse, it will be a snare to the testator ; and, instead of being a *prevention*, it will be a *protection*, of fraud.

I will close this reasoning with the words of the Court, in *Lea* v. *Libb*, as reported in *Carth.* 37.

" 'Tis true, the intent of the statute was to prevent fraud ; but

In this State, there has been no settled practice of admitting corporators as witnesses, in cases where the corporation is interested, except upon the principle of *ne-*

" though no suspicion of fraud appears in this case, yet the statute
" hath prescribed a certain method, which every one ought to pur-
" sue, to prevent fraud." (*l*)

If this is the true language of the statute of frauds; the consequence is undeniable, that the incompetency can never be purged, and that the whole will is void forever.

This consequence is so plain, that the argument on the other side, in order to call off the attention from this idea of fraud, has laboured to disparage and enervate the whole clause. With this view it is urged, that the word " credible" (which I consider as the key of the clause) deserves no notice, but ought to be expunged, being, as it is contended, either improper, or, at least, nugatory. Nor does the argument stop there ; but proceeds to pronounce the whole clause, loosely, and inaccurately penned.

So that, at last, this famous law, every line whereof, according to Lord NOTTINGHAM's opinion, (*m*) was worth a subsidy, turns out to be careless and ill penned, nothing more than a fruitless, an ineffectual solemnity. But to proceed,

1. The word " credible," it is said, either means too much, and is misapplied, or else it is included in the word " witness," and means nothing ; that the epithet credible has a precise meaning, universally allowed, and is never used as synonymous' to competency ; that when it is applied to testimony, it presupposes evidence to have been given, and after the competency of the witness is allowed, the objection to his credibility arises. In this sense, it is absurd to apply a quality to the witness, at the time of attestation, which can never belong to him, till his testimony is examined in court.

As the argument here turns altogether upon the meaning of this word, I wish it had given us that precise meaning, which seems universally allowed. That is not done by any definition ; it was

(*l*) *Mr. Justice* DOBEN *said,* " *It would be a dangerous consequence to make so wide a breach in the statute.*" Comb. 176.

(*m*) *Lord Keeper* NORTH's *Life*, 109.

*cessity.* In *Smith* v. *Barber,* (*q*) the inhabitants of Torrington, residuary legatees, were admitted to testify, that the defendant, *Barber,* had collected certain mon-

(*q*) 1 *Root* 207, *anno* 1790.

thought so plain and obvious that there was no occasion for it ; and, therefore, instead of telling us what the word does mean, the argument is pleased to assert what it does not mean : *i. e.* It is never used as synonymous to competent.

In answer to which, I beg leave to say, that it may, even in common speech, be so used ; and further, in this statute, it must have that meaning, and no other.

And that this is not a *gratis dictum* will appear from the case of *Hilliard* v. *Jennings,* wherein the Court of King's Bench not only declared the two words " credible" and "competent" to mean the same thing, but rested their main argument upon that very meaning of the word " credible."

But of this more hereafter ; in the mean time, I will endeavour to explain the sense of this word " credible" as I understand it ; and hope to shew, that the statute has used it very properly, and that it is not misapplied.

I understand the word " credible" to mean *worthy of credit.* When applied to the person of a witness, it bespeaks him to be *a person of capacity to deserve credit.* I say, of capacity to deserve it : I go no further, because no man can be sure of obtaining credit, let him be ever so credible ; and, therefore, I suspect that the word " credible" has been used improperly, in the last passage, for credit, which means a great deal more.

Now a witness is credible in two senses :

1. When this quality is predicated of him, or denied to him, in the abstract, without referring to the testimony of any particular fact.

2. He is credible, or not, in another sense, when the matter of his testimony, in a particular case, comes to be discussed and tried.

A man, therefore, may be credible in the first sense, though *not* credible in the second, and yet the word properly used in both.

1802.

CORNWELL
v.
ISHAM.

ies, &c. " The Court doubted, at first, upon the princi-
" ples of the law ; but, *upon the ground of necessity*, as
" the said *Daniel* [the testator] lived and died in said Tor-

When you apply this epithet to legal witnesses, that law, where it
is so applied, must determine the meaning.

Now, if I ask this general question, who are credible witnesses by
the law of England, *i. e.* persons worthy to obtain credit ? If the
question is not absurd, I can give but one answer to it : All such
persons as are permitted to give testimony in the courts of justice.
Who *not* credible ? Those who are not permitted.

The very admittance of the person, to be examined, proves him,
in the estimation of law, worthy of credit, while he stands unim-
peached, by calling him competent.

But, when a witness's testimony is under trial, and I am asked,
whether such a deponent is a credible witness to those facts ? I must
take in a thousand circumstances, in order to judge fairly of his cred-
ibility *quoad hoc.*

In this case, I admit that you presuppose the evidence given, be-
cause his credibility then depends not only upon his personal charac-
ter, but likewise upon the evidence given, with many other circum-
stances.

This general character of credibility in the abstract, is so insepa-
rable to the person of a disinterested witness, that nothing but an in-
famous judgment can ever deprive him of it. He is disbelieved in
one cause, he is, notwithstanding, a credible witness in the next ; he
fails there, yet in a third he may obtain credit ; let his conduct, or
general character, be what it will, he is a credible witness to every
fact, wherein he has no interest.

When I say that all indifferent witnesses are credible, I do not
mean *equally so ;* for credibility may have its degrees ; his rank or
character may make him more or less credible ; but it is sufficient for
my purpose, if the worst is intitled to any degree of credibility.

Now, where a man's testimony is impeached, this general char-
acter of credibility is no longer considered otherwise than as a cir-
cumstance ; and the inquiry is changed into a scrutiny of his credi-

" rington, it was to be presumed, that other evidence could " not be had." If it were the settled practice of our State, how easy would it have been to say, the interest

bility to that particular fact. And here, men of all ranks, character, and fortunes are equally liable to the same inquiry ; it is by no means a consequence, that the best man should turn out the most credible witness ; every day's experience proves the contrary ; and a bad man is not only allowed to be a good witness, but, sometimes, even a better than a much better man.

In this place, it is proper to observe, that the *good character* of the *man* has been confounded with the *credibility* of the *witness*, which are two different things ; for the statute was never so simple, as to require the attestation of *honest men*,—a matter impossible either to be known, or tried,—but only demanded *indifferent witnesses*, a description equally understood, and plainly triable ; indeed, every man living is honest enough to tell the truth for a third person, if he has no motive to do otherwise.

Nor is it strange, that a bad man, in some cases, should be a credible witness, and a good one not credible ; for credit is not in the power of the witness, but is lodged in the third person, and is a matter of the nicest and most difficult discussion.

The slightest circumstance may turn the balance ; probability in the tale, collateral confirmations, or impeachment by other evidence, contrary declarations, tamperings, the confident or modest demeanor of the witness, hesitation, confusion, prevarication, self-contradiction, compared with the contrary behaviour : These, and many other considerations, conspire to create; or destroy, belief ; and, therefore, the general character of the man is of no great moment in weighing the credibility of his testimony ; for I appeal to experience, whether general character is ever called in to impeach a person's evidence, till some strong attack, from another quarter, is made to his credit ? and therefore, every man, without exception, who is free from all interest in the fact he comes to attest, is a credible witness, *i. e.* he deserves credit ; nay, he is always believed, unless some objection, besides character, is raised against his testimony.

Thus much being premised, give me leave to apply this reasoning to the statute before us. Who are those credible witnesses, who are

is in the corporation, and corporators *are always admitted* in such cases!

In *Newell's case*, which related to certain transactions,

called upon to attest? The answer is plain; those who are intitled to the general character of credibility; who are free from infamy, and disinterested; who can neither get, nor lose, by the will. In this sense, and in this only, can the word possibly be understood, and, therefore, it is so far from being true, that credible is never used as synonymous to competency, that, on the contrary, wheresoever it is considered in the abstract, and applied to the idea of legal witnesses, it must be always synonymous to competent.

It is worth observing here, that credibility is so inseparable to all men who have their senses, that the epithet incredible, is never applied, in common language, to the person, as it is to his testimony. You say a fact is incredible, as well as credible; but you never say a witness is an incredible person. For there is not any man breathing, who is not capable, though perhaps not worthy, to obtain credit, if you hear his testimony. And, indeed, the true reason why infamous and interested witnesses are rejected, is, for fear they should be believed; and, therefore, such persons are properly called incompetent, and not incredible, which mode of expression introduced competent in law language, as the opposite, instead of credible.

When the statute, then, requires three *credible witnesses* (for it does not say three *reputable persons*) to subscribe, it requires three disinterested persons, who are not infamous, and no more.

All such are credible to that fact, wherein they have no interest; this may be pronounced of the worst man, and you can say no more of the best; for they are both credible as they stand upon the will, though perhaps not in the same degree.

1. The acts which direct convictions to be made upon the oaths of *credible witnesses*, mean *competent*, as I conceive; and if the witness has no interest, the magistrate ought to convict, if he is not contradicted. This cannot be denied; and I am sure the reason given why the informer cannot be a witness, is, because he is not credible, which proves pretty clearly, that if he had no interest, he would be credible.

1802.

CORNWELL
v.
ISHAM.

in which the First Society in Torrington was interested, the members of that corporation were rejected as witnesses, because it appeared, that other persons might be

2. And though Lord COKE, when he advises the testator to call credible witnesses to attest his will, may mean to recommend the most credible, such as are reputable persons, as well as competent witnesses; yet there is no ground to infer from the expression, that any competent witness, in his opinion, was totally non-credible.

But, if this be the true meaning of the word, then they contend that it is an idle, nugatory word, as being included in witness.

Admit it, for a moment; must the clause be condemned, or lose any of its weight, because an epithet might have been omitted? How few laws could escape censure, if any synonymous words should prove them guilty of inaccuracy? I should rather think, that the contrary ought to be presumed; because this tautology generally proceeds from abundant caution, the writer thinking it safer to over load the sentence, with many impertinent words, than to omit one material syllable.

But I shall not be satisfied with this apology; because I apprehend that the word credible, upon further examination, will turn out to be not only proper, but extremely useful, in this place. For, suppose the Parliament had reasoned in this way, while they were settling the clause: The word witness alone, according to the best construction, may perhaps be determined to mean the same as credible witness; for our intention to protect the testator from fraud, will naturally lead to such a construction. But, suppose some future interpreter, if credible is omitted, should take advantage, from the omission, to expound the law contrary to our intention; suppose he should argue from hence, that the statute, by adding no qualification to the witness, has shewn that we never meant to provide against fraud, by this attestation; that, therefore, this part of the ceremony is mere form; and, that the common law method of dealing with witnesses ought to be adapted to this statute, by which the incompetent witness may be restored, by a release, or payment. I will not say, that this difficulty did actually occur to the penners of this clause; but this I can say with great confidence, that they who have thus commented on this clause, in spite of the word credible, would have argued more plausible, if that word had been omitted; whereas,

had. This decision cannot be reconciled with the principle of a settled practice to admit parishioners, where the corporate interest is concerned.

now, by the assistance of this epithet, we are sure, from express words, that the witness must be competent, at the time, or else the will is void. Such a word, then, may fairly be deemed both proper and materials if it serve to make a passage clear, which, without it, would be obscure and ambiguous.

Not barely three witnesses, not three competent persons, in a loose sense of the word, are witnesses; not three *Baynhams*, first bribed, by a legacy, to join in the fraud, and then bribed again, by payment, to fix it; but three credible, *i. e.* unattainted, disinterested witnesses.

The words so used, to say no more, strongly mark out the sense of the legislature, and call upon the attention of the Court to that competent qualification of the witness, at the time. In my opinion, therefore, the word has a strong, significant, and forcible meaning.

Neither can I be brought to think the clause so inaccurate, in other particulars, as it hath been described. Some few questions, indeed, have sprung out of it; but they are all questions of subtility, and such as might have been drawn out of the best chosen words. Pen a clause how you will, there will be always room for liberal construction to enlarge, and rigid construction to restrain; that, and no more, has been done on the present clause. In the formal part, the judges have been liberal; they have gone as far, and perhaps farther, than the words will bear, to establish the will, where the want of formality was only objected.

Sealing shall be signing $(n)$; delivery as a deed, shall be publication of a will $(o)$; the witnesses may attest at different times $(p)$; the presence of the testator shall not be confined to the very room $(q)$.

It is beyond the power of penmanship to anticipate such questions;

$(n)$ 2 Stra. 764.
$(o)$ 8 Vin. Abr. 125. pl. 13.
$(p)$ 2 Chanc. Cas. 109.
$(q)$ 2 Salk. 688. Carth. 81. 12 Mod. 37. 3 Salk. 395. pl. 1. Comb. 158.

K

In July, 1795, the case of *Starr* v. *Starr*, relating to *Mortimer's* will, was argued. The will contained the bequest of a granary to the City of Middletown, and the

and it must always be remembered, that the rules of construction were framed to supply the defects of human language and capacity. Nor do I think it would dishonor my Lord HALE's character, to be reputed the author of this clause, (which, by the by, he might have been, though he died before the statute passed;) for I cannot help subscribing to the opinion of a great Judge, who said that these decisions were rather a reproach to the profession, than to the clause.

If the law is then vindicated from this charge, and if it is, as the legislature has called it, in the very last act, (r) an excellent law, the judges ought to take the utmost care not to weaken the force of it, by a mistaken favour to wills, remembering always, that the legislature meant to prevent fraud, not to multiply wills; much less ought they to treat the objection to the legatee witness with slight, by calling it form, when the legislature, even in their last act, (s) have unwitnessed the legatee, as such, by annulling his legacy.

This last act has, in effect, considered the legatee as totally incompetent. This last act has, in effect, pronounced, that the testator cannot be safe under such witnesses. This last act, though it has varied the method, has done the same thing, and worked upon the same principles; and both acts, by different ways, arrive at the same end. The one disables the legatee from being a witness. The other disables the witness from being a legatee. Where is the difference? Both concur in saying the same person shall not be a witness and a legatee.

I come now to the great leading case upon this point, viz. that of *Hilliard* v. *Jennings*, which I conceive to be a direct authority to shew, that competent and credible witnesses are the same, and the true reason of requiring three credible witnesses, was to protect the testator from fraud.

The argument on the other side, has taken the report of this case

(r) *The words of the legislature are* " *which (viz.* Stat. 29 Car. c. 3. sec. 5.) *hath been found to be a wise and good provision.*" *Preamble to* Stat. 25 Geo. 2. c. 6.

(s) 25 Geo. 2. c. 6.

witnesses were three citizens. The question as to their competency was very particularly discussed; it was twice argued; the Court heard the counsel with great pa-

from *Carthew*, deeming him the best reporter, because he was counsel in the cause, and has not reported the general principle, upon which that case was ruled; has taken it for granted, that it was ruled upon no general principle, though the other reporters have freely stated the argument at large, together with the grounds of that resolution. This makes it necessary to examine *Carthew's* report with more attention; and, if I am not mistaken, he will appear to be the worst reporter of them all; though, at the same time, they will be found to correspond, and be perfectly consistent, when they are compared together.

The words of *Carthew's* reports are:

" This will was void *quoad* the devise of the lands to the plaintiff,
" because he being the person to whom the lands were devised, can-
" not, by law, be allowed to be a credible witness, to prove the exe-
" cution of the will, on his own behalf; wherefore, with respect to
" this devise, the will was attested only by two witnesses, which is
" not sufficient to answer the statute." (t)

In order the better to understand this book, give me leave to state the case, and draw the argument of the Court upon the point into a syllogism.

The case stated is no more than this:

The statute requires three credible witnesses to attest, and devisee of the lands is one of those three witnesses.

The argument upon which the opinion of the Court was founded, may be thus drawn into a syllogism.

The general principle, or the major of the syllogism:

No person, who would be incompetent to prove a will, upon a trial, can be credible to attest it, upon the execution.

(t) Carth. 514

tience, and, at length, waived deciding upon a question of so much difficulty, and determined the case upon other grounds. But,

This major is proved by other arguments, which I will not repeat, shewing that the statute would be evaded, by any other construction.

The minor :

The devisee, in this case, would be incompetent to prove.

*Ergo*, he is not credible to attest.

Every body knows, that the minor of a syllogism is derived out of the major, which is a general proposition, either self evident, admitted, or proved by the arguments ; and that an argument cannot be perfect without the major.

Now, Mr. Sergeant *Carthew* has reported only the minor, and the conclusion, and has totally omitted the major proposition.

The two last members of the syllogism, in that book, are thus expressed :

The plaintiff cannot, by law, be a credible witness, to prove the will, in his own behalf.

*Ergo*, the will is void, *quoad* this devise.

Thus, he informs you, that the witness' credibility, in this case, is determined by the consideration of his competency at law.

But why that competency at law comes to be the criterion of his credibility under the statute, the book explains not, but leaves that principle, which is the major of the syllogism, to be collected by the reader.

This is one defect in the report. But there is another, which is still more misleading ; and that is, that he has narrowed his conclusion to the very case before him, by saying the will is void *quoad* this devise, and with respect to this devise; by which emphatical manner of confining his conclusion, he seems to intimate, that the

*5.* If such a practice has grown up, and become set‑ tled, it extends only to cases, where the witnesses are admitted *from necessity.* Thus, questions relative to

will might be good as to every other devise. Whereas, if he had stated the general proposition, from whence this consequence was deduced, his report could not possibly have been mistaken.

True it is, that when the will comes to be looked into, you see the true reason, why he has laid so much stress upon this specific devise, not because he meant to distinguish a devise to the witness, from any other real devise, in that, or any personal estate ; and, as this was the only real devise, he reports the will void in this part, only in op‑ position to the personal part, wherein the will was good.

Now, let us see the use that has been made of this report, by the argument on the other side.

By omitting the general principle, upon which that case was de‑ termined, it has formed that particular decision into a general rule, by which the general principle is contracted to that particular case. The rule is this :

That no witness, by his own subscription, shall take an interest, after the statute, which he could not prove, at that time, by his own examination.

I do admit this proposition to be true, as far as it goes, and to be so resolved by the Court. But, I say, the Court went further, and resolved that no such interested witness could establish any part of the will, but that the whole will would be void, *in toto,* as well as his own particular bequest ; so that when it is pretended, that the Court confined the resolution to the particular case before them, and meant to extend their doctrine no farther, I do, with deference, de‑ ny this inference, and will prove the contrary from the case itself, as reported by the several authors, and Mr. Sergeant *Carthew* shall not be omitted.

The best way to understand the grounds of the resolution is to state the arguments on both sides.

Sergeant *Carthew's* own argument in favour of the will :

the commorancy of paupers ; relative to boundaries ; relative to town or society transactions ; disputes between ecclesiastical and school societies ; and many others of

" 1. The plaintiff is a man of an indisputable credit.

" 2. Though he cannot be sworn, upon a trial, yet one cannot
" say but that there were three witnesses to the will ; and the will
" has been well proved by the other two witnesses.

" 3. There is a difference between a matter which goes to the
" credit of his testimony, and a matter which goes in bar of it. The
" first sort are excluded from being witnesses, by that statute ; as a
" man attainted of treason, &c. But, where there is only a thing
" which bars him from being a witness, but does not touch his cred-
" it, it is otherwise.

" 4. The intent of the act was to prevent perjuries ; but this can-
" not be within the mischief of the statute, because the devisee be-
" ing a witness, could not be sworn and examined upon it, and,
" therefore, out of the mischief of the statute.

" 5. That this statute has been taken with a liberal construc-
" tion." (*u*)

The same argument thus reported by Lord Chief Baron COM-
YNS : (*v*)

" Although the plaintiff cannot be examined as a witness, in his
" own cause, yet the will being proved by other witnesses, he is a
" credible witness to the will, although not in this cause ; and there
" is a diversity between a person who is infamous, and incapable to
" be a witness at all, and such an one who may be a witness, but,
" in a particular case, is not allowed to be examined, in respect of
" his interest."

Now take the argument on the other side, and the resolution of
the Court.

" 1. Against this, it was argued, by Mr. *Pratt*, and held by the
" whole Court, that this will was not well executed according to the
" statute of frauds. For a man who cannot be a witness, which is

(*u*) *Lord* Raymond, 506, 507.        (*v*) Com. Rep. 91.

a similar kind, all proceed upon the principle of necessity, which creates an exception to the general rule of evidence. But, when the necessity does not exist, as in *Newell's case*, testimony is to be derived from a purer source.

" the plaintiff's case, cannot be a credible witness. (*x*)   And the in-
" tent of the act was to prevent frauds, as well as perjuries ; which
" intent would be evaded, if the devisee should be admitted to be a
" witness, who being a party interested might probably be induced
" to use fraud.   And Mr. *Pratt* said, that the statute appointed three
" witnesses, &c. to the end that it might be done in such a solemn
" and notorious manner, that they might see, that the devisor did
" not suffer any imposition, being infirm as well in understanding as
" in body, as all men generally *in extremis* are.   But, if persons who
" cannot give evidence of their subscriptions, &c. shall be admitted
" to be credible witnesses, the intention of the act will be entirely
" evaded.

" And for this point, the whole Court were of opinion, to give
" judgment for the defendant." (*y*)

" As to the other point, Sergeant *Pratt* argued, and it was held by
" the Court, that the will was not well executed ; for the plaintiff
" was not a credible witness, as he himself was to take by the will ;
" for the intent of the statute was to prevent any practice by persons
" interested in the obtaining of a will ; and if he who is to take by a
" will may be a good witness, it will be an encouragement to such
" practice." (*z*)

To these I will add a third, which my brother GOULD has favour-
ed me with, taken by his father, one of the judges who determined
that case :

" By direction out of the Court of Chancery, the question was,
" whether a devise of Enshall Farm, by *Thomas Jennings*, to *William*
" *Hilliard*, and his heirs, be a good devise, he being one of the sub-
" scribing witnesses."

" Objection :   a good devise, so long as three subscribe and wit-

(*x*) Freem. 510.   12 Mod. 277.   (*y*) *Lord* Raym. 507.
(*z*) Com. Rep. 95.

It was admitted in the Court below, that if the testa-
tor had been at Hartford, and the witnesses to his will
had been inhabitants of Colchester, the exception to

" ness it ; for 'tis credible, which is in opposition to a person attain-
" ted ; but if two of the witnesses were dead, then, indeed, it
" might be bad.

" But, resolved for plaintiff, by the whole Court, clearly, that he
" not being credible to prove the will, the devise is a void devise.
" For the design was to set up a credible swearing witness, and this
" to prevent fraud and perjury,"

Several material observations arise from the case thus reported :

1. They do all agree with *Carthew ;* the only difference between
the books being this, that the latter report the resolution without the
reasons, the others report the reasons, as well as the resolution.

2. The Court took it to be a case of construction upon the statute,
and nothing else.

3. They considered the credibility, as well as the attestation, to
be the very substance and essence of the business.

4. They ruled credible to be the same as competent.

5. They not only held this necessary to prevent fraud, but held
likewise, that if they gave credible any other sense, the statute
would be evaded.

And, therefore, the rule of construction, laid down by the Court,
was general to annul all wills and all real devises whatsoever, where
one of the witnesses was incompetent.

I have done with the first point, and have proved, as I hope, both
by argument, and authority, that proposition which I under-
took to maintain, viz. That the credibility of the statute meant
competency, and that this was a necessary and substantial qualifica-
tion in the witness, at the time of attestation. Which brings me to
the next consideration, Whether the witnesses to this will come
within that description ? Being now in possession of the true crite-
rion of credibility, which is no other than competency, this is a mere

their competency would have been well founded. Why? Because such witnesses *were not necessary.* And if the will is made at Colchester, provided other testimony

common law question, and, therefore, I shall produce the witnesses in court, and take the objection to them, before they are sworn.

The case is this :

The testator devises certain lands to trustees, to be applied to the use of such poor, as, by reason of infancy, impotence, or old age, are unable to work, and to place out the children of such poor, apprentices ; and declares, that the rents shall be applied to no other use or purpose.

Three witnesses who attested the will, are seized of lands in fee, within the said parish, at the time of attestation.

The objection is, that these witnesses cannot be admitted to prove the will, in court, while they remain so seized, because, by the establishment of the will, they will derive an interest to themselves, in respect of those lands.

Their interest is this, that, as the poor's rate must be reduced, in proportion to the value of this benefaction, their estates will become rate-free, *pro tanto,* forever. And, although the devise, at the time of the testator's death, was future, and did not take effect 'till 1740, twelve years after, yet it was a present benefit to the owner of those lands, and made them immediately more valuable, in consideration of this future easement.

I have many arguments here to encounter, both from bar and bench. I shall endeavour to answer all, to the best of my power, and with all that respect, which their opinions always deserve, where we differ.

First, it was said, that the poor here described must be understood to be a class of poor just above the necessity of relief, and that this charity may be applied, by the trustees, to the use of such persons, exclusive of the parish poor. To which I answer, that the poor in this will are those who labour under the extreamest weakness of helpless poverty. For, when it is considered, that the day-laborer, who only lives from hand to mouth, is deemed, by the testator, to be

L

might have been had, the cases are precisely similar. The argument, aside from the principle of necessity, would be the same, then, as it now is.

a person above the want of this charity, which is confined to the impotent only, those who have enough to subsist on, without labour, must, *a fortiori*, be excluded.

2. The poor, in this will, are denoted by the same description as the parochial poor are, by the 43. *Eliz.* c. 2. And if this be so, this charity cannot, by the terms of it, be distributed to a set of men, who are excluded by the will; it will be a breach of trust to do it; and if it be said that the Court of Chancery can direct the money to be applied to a superior order of poor, I desire a case to be produced, where that Court has ever made such a decree. If a legacy had been given to poor house-keepers, and poor not receiving alms, or to poor in general, there might be, perhaps, some grounds for that distinction. But I can never believe, that the Court could make such a decree in this case; the business of that Court being to expound wills, and not to make them.

And whereas it is said, that those legacies, when they reduce the rate, come to be, in their operation, legacies to the rich and not to the poor; I answer, that it is impossible to be otherwise; and though this is always to be supposed to be contrary to the testator's intention, no man living can be sure of that, and I do much doubt it; for why may not a man mean, at the same time, to give to the poor, and likewise ease the parish? The poor's rate is a most heavy burden; it falls upon the tenant and occupier, and is paid by those, who are not above a degree or two richer than the object he is forced to relieve; so that he, who thus disposes of his estate, is a double benefactor. But be this as it will; if a gift is made to the parochial poor, it must reduce the rate *ex necessitate*, though the testator may possibly intend otherwise.

My brother GOULD contends, in the next place, with whom my two brothers now concur, that this benefaction should not be considered as an ease to the parish, but as a bounty to be added to the parish relief, for the comfort of the poor, and not for their subsistance.

By the 43 *Eliz.* c. 2. the parish are only taxable for the necessary relief of the poor. Nothing, therefore, but necessity, can call for this relief; if the party can subsist, by any means whatsoever, with-

Whether there was a necessity or not, is always a *question of fact*. In this case, the fact must come from the defendant. The plaintiffs object to certain persons, on

out this aid, he is not the object of this law ; nor can it ever be material to consider, from whence the pauper is supplied ; if he has wherewithal to subsist, without the parish, the parish must be discharged ; because the relief, in such a case, is not necessary.

And as the necessity of the object is the rule, by which the relief is to be apportioned ; it must be more or less, according to the pauper's condition and circumstances.

If a labourer, who gets seven shillings a week, by his industry, is incumbered with a large impotent family, the parish adds so much to his weekly gain, and no more, than will be just enough to keep the family alive ; if he falls sick, the allowance is increased ; if his children die, or become useful, it is diminished.

One has a little close, worth forty shillings a year ; his stipend will be less than his neighbour's, who has but twenty shillings a year ; and his gain will be less than another's, who has nothing.

This is the true reason why the rate is directed to be made weekly, or otherwise, because the state of the poor is always fluctuating.

An estate, or legacy, is given to the poor. If, in this case, the rate must continue the same, without any regard to this benefaction, you call upon the parish for a superfluity ; for, as far as the rate added to the charity, will exceed the sum necessary for their subsistence, the parish is taxed just so far beyond the sum necessary for their relief, and so contrary to the act of Parliament ; for relief and subsistance are synonimous terms.

This duty upon the parish is so connected with the necessity of the pauper, that if a testator, bequeathing a legacy to the poor, should say, " I mean that the poor should enjoy the same parish allowance over and above my legacy," the clause would be *felo de se*, and void, unless it can be maintained, that he who has something, is as poor, as he who has nothing ; for if he is richer, he wants less relief, and if less relief, a lower rate will do. So that if the legacy takes place, the parish must, of necessity, be eased.

the ground of *their interest.* This general objection, if unanswered, is *fatal.* If there is any circumstance, that operates by way of exception, the person who would

I have been arguing upon an allowance of money. Suppose a testator bequeaths a legacy to clothe the poor, or an house to receive them, or a sum of money to apprentice out children. Must the parish still clothe, lodge, and bind out as they did before ? Or, must they add the value of the clothing, house, &c. to the former allowance, and so give the poor a superfluity above their necessary subsistence ? I think that cannot be contended for ; and yet a gift of an house or clothing is as much a bounty to this purpose, as a gift of money.

If I suppose in arguing, which I have a right to do, that the charity is ample and sufficient to maintain all the poor, my brother GOULD does not even choose to deny, that the parish, in this case, must be eased ; but if it is only a trifle, it is a bounty.

According to what I have said, let it be ever so small, it must operate *pro tanto.* But, if I should, for a moment, admit a distinction, will he be pleased to draw the line ? If he can do that, I may venture to promise, that I will come over to his opinion ; if he cannot, I think he ought to come over to mine.

Nor can there be any difference between a devise to trustees, and a devise to overseers ; the trust is the same in both, and the objects the same ; and the parish officers are but trustees, as the trustees, in the application of the charity, are parish officers ; the hands, through which the charity passeth, are, in both cases, mere instruments.

Neither is there one case to support my brother's notion, but all the authorities seem the other way ; for as often as this question has come before this Court, in the cases of penalties given by parliament to the poor of the parish, the Court has constantly held, that the rate would be reduced by those sums, and every parishioner eased *pro tanto.*

Yet, these are gifts ; why not bounties, in many cases more inconsiderable than the present ? Upon the whole, this idea of a bounty is novel at the bench, and of the first impression ; and when I was prepared to argue the case of *Portman,* v. *Otreden* upon this ground, the Court of King's Bench would not hear me.

take benefit of it, must produce it. The *necessity*, if any, arises out of the averment, that this transaction was done within the territorial corporation of Colches-

Where charity was given for the clothing of six poor persons of the Parish of E. Lord Chancellor MACCLESFIELD would not suffer any of the inhabitants of E. to be witnesses, because they were interested, as being eased in the poor rates. *(a)*

Lastly, what can be said upon the last use in this will, to bind out poor children apprentices? There the parish must be eased, unless they will choose to pay the master double the value.

To proceed now to the remaining difficulties.

The interest is nothing claimed under the will; it is nothing, in present; it is contingent, in future; it is minute.

To the first; it is not given to the parishioners, but it is an interest derived to the parishioners in consequence of the will, the common case of penalties given to the poor: they gain, if the will is established; they lose, if it is set aside.

To the next; it is no easement in present, I do admit; but in respect of future easement, it is now a present and a lasting benefit; and, in truth, (which will answer the next objection at the same time,) all future interests, whether certain or contingent, whether now or hereafter to be enjoyed, are present benefits, have a price, and are saleable.

The Court of Chancery, therefore, have very sensibly pronounced possibilities to be vested interest, and made them transmissible: A fee, expectant upon a thousand years term, has been sold for money. Let me put the case of an executory devise of an estate of 10,000 *l.* a year, and the life before it in a deep consumption; (I am entitled to put the strongest case I please;) could this devisee be a competent witness to prove this will? The answer must be, he could not. Tell me, then, what chances are valuable, and, what not? Till this line is drawn, I must insist that all chances are valuable.

Hence, if it should be said, that perhaps the parish may have no

*(a)* Wil. Rep. 600.

ter. (*r*)  Is it, therefore, *necessary*, in point of *fact ?*
For the law does not predicate necessity in this case.  It
would be strange if it should.  It might happen to pred-

(*r*) It does not appear, from the record, *where* the will was exe-
cuted.

poor ; I admit the supposition to be possible, and barely so ; but if
it be only as possible that they may be burthened with poor, every
estate that is discharged from this possible burthen, is, in that re-
spect, bettered, and must remain so, as long as the statute of 43
*Eliz. c.* 2. stands unrepealed.

As to the objection, that the interest is minute, and that a small
interest, as in *Townsend's case,* ought not to disqualify witnesses.

I do conceive, that however that point might have been litigated
formerly, yet now the law is clearly settled, and the witness must be
rejected, if he has any interest, be it ever so small.

The point was disputed, for above twenty years, in the case of toll
or custom claimed by the City of *London,* upon importation, called
by the name of *water-bailage.*

The question was, whether freemen might be witnesses ?  Noth-
ing can be more minute than such an interest ; and yet, after many
opinions *pro* and *con,* it was finally settled, that they were not wit-
nesses.

Any person, who has a mind to trace the history of this question,
may find it in 2 *Keb. Rep.* 295. *pl.* 84.   2 *Show. Rep.* 47. *pl.* 33. *Id.* 146.
*pl.* 127.  2 *Lev.* 231.  *Ventr.* 351.

This last case, and it is the last I can find upon the subject, 32
*Car.* 2. is differently reported in the two books, for one states (*b*)
that three judges (*c*) allowed the witnesses, and one dissented ; (*d*)
upon which the counsel for defendant tendered a bill of exceptions,
but the plaintiff gave it up, and called other witnesses.

(*b*) Ventr. 93.
(*c*) *Viz.* SCROGGS, *Chief Justice ;* DOBBEN *and* RAYMOND, *Justi-
ces.* Ventr. 351.
(*d*) *Sir* THOMAS JONES.

icate necessity of a transaction of this kind, passing in the view of a dozen strangers, and within ten rods of the parish bounds, where hundreds of disinterested witnesses

The other book says, (e) that the freemen were denied to be witnesses, and that the plaintiff tendered the bill.

I cannot reconcile the books, but both agree the witnesses were not examined, and the verdict went for defendant.

What became of the bill of exceptions does not appear; I should guess it was argued, and settled solemnly, that the freemen could not be witnesses, because it is so said by a Lord Keeper, and a Lord Chancellor, in *Vernon*.

1. Lord Keeper NORTH, in 1684, two years after this trial, said " he thought it very hard in the case of *water-bailage* of London, that no one freeman of the City, though it was not six pence concern to him, could be admitted as a witness." (*f*)

In 1694, Lord Chancellor SOMERS said, " In suit touching the loss and misapplication of a sum of money, given for the benefit of the parishioners, none of the inhabitants ought to be witnesses ; for in a case, where a party is concerned in interest, though never so small, the objection has always prevailed ; and it was so resolved, upon great debate, in the case of the City of London, concerning the *water-bailiff*." (*g*)

Upon issue joined upon a prescription for a toll, the defendants produced a witness ; the plaintiff objected, that he was a freeman, and so interested ; upon which the defendants produce a judgment, in the Mayor's Court, where, upon a *scire-facias* awarded, and two *nihils* returned, they had given judgment of his disfranchisement : But, upon inquiry, the man said, he was never summoned, and knew nothing of his disfranchisement ; therefore, the proceeding being irregular, HOLT would not admit the man to be an evidence, because the judgment in the Mayor's Court may be avoided. (*h*)

The statute of 3 and 4 *W.* and *M. c.* 11. *sect.* 13. is material for this purpose ; for, by that act of Parliament, " In all actions brought " in the courts at Westminster, or at the Assizes, for any money

(e) 2 Show. Rep. 48, 146. pl 127.    (*f*) Vernon 254. pl. 264.
(g) Id. 317. pl. 318.    (*h*) 11 Mod. 225. pl. 20.

**1802.**

CORNWELL
*v.*
ISHAM.

might be had. Necessity is an *inference from facts*, and it generally, nay, always, arises from a display of every necessary fact, from whence to deduce it. Now, no

" mispent, or taken by church-wardens, or overseers of the poor, the
" evidence of the parishioners, other than of such as receive alms,
" or any pension, out of such collections, or public monies, shall be
" admitted."

So again, by stat. 1 *An. st.* 1. *c.* 18. *sect.* 13. " In all informations or
" indictments, the evidence of the inhabitants of the town or
" county in which decayed bridges or highways lie, shall be ad-
" mitted."

Which acts shew, that the rule to reject the witnesses, for minute interest, could not be broke in upon, by less authority than an act of Parliament.

There is a case in *Viner*, (*i*) where it is said, that " In information
" by Attorney-General, at the relation, &c. on behalf of themselves
" and all inhabitants of the Town of Warwicke, &c. relating to
" charities, &c. a person an inhabitant receiving alms is no witness ;
" for every inhabitant either pays, or is under a possibility of paying,
" to the church, poor, &c. though he pays nothing at present."

If the rule be so, it must prevail as an objection to all witnesses, without exception ; and there can be no difference between witnesses to a will, and any other ; I say this, because I see a practice had prevailed to admit will-witnesses, where the legacy was small.

In the argument of the *water-bailage* case, it is said, that " a small legatee has been sworn to prove a will," (*j*) and that it had been usual. (*k*)

And Lord NORTH is made to say, " it was usual where a man was a legatee, if it was an inconsiderable legacy, as five shillings (or five pounds to a man of quality,) that he should nevertheless be a witness to prove the will." (*l*)

(*i*) 12 Vin. Abr. 18. pl. 19.          (*j*) Vintr. 351.
 (*k*) *Sir* Bartholomew Shower, (*who reports same case, by the name of the* King *against* Carpenter,) *his words are* " *hath sometimes been allowed a witness to prove a will.*"   Show. Rep. 47. pl. 33.
 (*l*) Vern. 254.

principle is clearer than this, that a court of law cannot find a fact, unless it is directly averred, or unless it results by necessary inference ; neither of which appears in this case.

It is plain there had been such a practice ; and I take it to be upon that ground, that the parishioner was allowed to be a witness in *Townsend's case ;* but that practice ceased, I believe, upon the statute of frauds.

But, I take it most clearly, that this notion is now exploded ; and, therefore, if it shall be once admitted, that the parishioner in *Townsend's case* had an interest under the will, the case neither is, nor can be law, till it can be proved, that a legatee of a *small sum* may, at this day, be a witness.

True it is, that the interest of the witnesses in some cases, is drawn so fine, that it is scarcely perceptible ; and yet that glimmering, that *scintilla*, shall be as powerful to exclude the witness, as the most substantial profit ; and I have always understood, that case (*m*) to be good law, where the Court set aside the witness, because he thought himself bound in honour to pay the costs of the suit.

The true ground whereof is this, which is fit to be attended to, in every part of this branch of the argument ; that as no positive law is able to define the quantity of interest that shall have no influence upon the minds of men, it is better to have the rule inflexible, than permit it to be bent by the discretion of the judge.

THE DISCRETION OF A JUDGE IS THE LAW OF TYRANTS; IT IS ALWAYS UNKNOWN; IT IS DIFFERENT, IN DIFFERENT MEN; IT IS CASUAL, AND DEPENDS UPON CONSTITUTION, TEMPER, AND PASSION. IN THE BEST, IT IS OFTENTIMES CAPRICE ; IN THE WORST, IT IS EVERY VICE, FOLLY AND PASSION, TO WHICH HUMAN NATURE IS LIABLE.

I have done with this part of the case, and return again to the statute of frauds, and the next point, which is, whether a witness, not credible at the time, can become so, by matter *ex post facto,* so as to re-establish the will.

(*m*) *It is reported in* Stra. 129.

M

Further, in a large town, through which hundreds are daily passing, such necessity cannot be presumed to exist.

Again, the *time* and *place* of execution were, in no

If my construction is right, the will, upon the attestation, is, *ipso facto*, void, by the very words of the statute.

THE TESTATOR HAS BEEN BETRAYED; THE FRAUD IS COMMITTED; AND YOU MAY AS SOON RECAL TIME, AS MAKE THAT TRANSACTION HONEST, WHICH WAS ORIGINALLY FRAUDULENT; NO PURGATION CAN CLEANSE THE WITNESS.

I say, if I have construed the statute right, *every such attestation is a conclusive mark of fraud* upon the will, against which no evidence can be given; and though it has been said, that a legacy is no present interest, and that the legatee does not know the contents of the will; I answer, that if it shall be once held, that such a will may be established by the legatee's release, every legatee, who intends a fraud, will always, for the future, be sure of the contents, before he attests.

But still, it is argued, that if you pay or release the legatee, he is a good witness; his bias is gone; the will shall be established.

It is difficult to say, whether this doctrine is more pregnant with mischief, or absurdity.

1. It furnishes the will-maker with bribes to the witnesses, out of the testator's own estate, to deceive himself, and disinherit his heirs; nor is it possible to give the witness a stronger security for his legacy, than by making him a witness, because, by this means, his release being necessary, he gains a power over the whole will. Thus, the law co-operates with the fraud, in requiring the devisee to pay the witness his hire before, under the penalty of setting the will aside, if he refuses.

But the mischief will not stop here; the legatee will naturally proportion his demand to the value of the estate bequeathed; and will frequently exact more than his legacy.

Nay, he will think it worth his while to hold himself out to the

respect, *necessary.* For aught that appears, the will might have been executed at any other time, and at a different place, where disinterested witnesses might ea-

heir, and keep the will in suspence, till the one or the other is brought to his price, and thus the testator's lands, after his death, *will be sold, by the witness, to the highest bidder.*

To day the will is bad, for the legatee will not release ; to-morrow the legatee is satisfied, and the will is good : The heir at law recovers in one term, and he is disinherited in the next.

In this state of uncertainty the will must remain, till the legatee is pleased to pronounce its fate.

But suppose the witness should die before he has released ; nay, put the case, that he dies before the testator ; is the will good, or bad ? If good, he is a credible witness, and needs no purgation ; if bad, he is not credible, and incapable of it.

Again, let us suppose the witness convicted of some infamous crime, can the Crown restore the will by a pardon ? In that case it depends upon a casualty, and the King disposes of the estate.

Among all the difficulties, one might have expected some rule would have been laid down to fix a certain period for the establishing or annulling of the will, by telling us how long the incompetency of the witness was to violate the instrument ; for it is impossible to conceive it could remain in this state of fluctuation forever.

I have endeavoured to find out this point of time, from the argument on the other side, without success. It is said, indeed, that the time of examination could not possibly be the criterion, on which the will was to depend ; because the witnesses might not live to be examined, and their incompetency might arise long after their signing. I do not clearly conceive, that this cannot be the criterion. The only fixed period remaining is the time of attestation ; but the whole argument on the other side is brought to prove, that that point of time cannot be the criterion ; so that both these periods being excluded, it doth behove the counsel for the defendant to point out some other ; but the argument is silent, and the will is left, at last, after so much pains, to float upon that sea of casualties I have been describing.

sily have been procured. It was a *premeditated* transaction, of the highest importance.

There are peculiar and weighty reasons, why the wit-

The common received usage, with the opinion of eminent practitioners, has been called in aid, and they have been named; Mr. *Fazakerly*, and Sir *Thomas Bootle*. They are great names, and I have an high regard to their opinions. The general practice, too, of the Hall, is always a weighty argument, and should never be slighted. I don't find that this practice, as it is called, ever went beyond the cases of money legacies, which sprung up, as I guess, from the practice in the Spiritual Court, where a release, to this day, will make the witness. But it is not pretended, that this practice ever prevailed so far, as to admit a release, or payment, to restore the witness, where he was a real devisee; so far from it, that *Hilliard* v. *Jennings* passed always for law, without a murmur; and it was not till after the true principle of the statute of frauds came to be thoroughly discussed and settled, in the case of *Anstry* and *Dowsing*, that those practitioners came to be alarmed. Then, indeed, their eyes were opened, and they begun to fear, that if the Court of King's Bench was right, the practice and their opinions were erroneous; but as the principle was stubborn, and would not yield to any exception, the legislature very properly took it in hand, and has, with great wisdom, cured the evil, without weakening the statute of frauds, which no court of justice was able to do.

But if those points fail, the defendant's counsel resort to another, which will, at once, solve all difficulties; and that is, that the witness, notwithstanding the objection, may still remain a good witness, to every other devise but his own.

If this be done, it will be a method of setting up the will, by annulling the legacy; for a legacy that cannot be proved, is the same as no legacy at all; it is a nullity; it does not exist: *de non apparentibus, et de non existentibus, eadem est lex et ratio.*

This, I do admit, will solve all difficulties at once, and will render the legatee as safe and disinterested a witness, as if he had no legacy.

And if this had been the law, it would have saved the legislature the trouble of a new act; for it is the very method which the Par-

nesses to wills should, beyond all other witnesses, be impartial and disinterested. They are to exercise a *judicial discretion.* They are to *try* the sanity and free-

liament has now taken, who, by making the devise void in this case, has disabled the witness from being a devisee ; and this has effectually cured every difficulty, and removed every mischief.

It remains, then, to be considered, whether the attestation of a legatee before the act of 25 *G.* 2. *c.* 6. made his legacy absolutely void ; for I must insist upon it, that he can never be a credible witness to any part, upon any other ground, than the original nullity of his own legacy ; if the legacy is not void, then this interest attaches at the very instant of the attestation, and vitiates the whole will forever, unless the fact can be purged afterwards, by release.

Now, that the gift or legacy is void, I do beg leave, with great deference to other opinions, to deny.

In all those cases, if I am not mistaken, the only reason why the witness is rejected, *is because his legacy is good.*

Consider the case of a will before the statute ; if attested by the legatee, it was not void in its creation ; it was only held back from operating, from defect of proof ; and, therefore, the moment the proof was opened, either by payment or release, or if the will could have been proved by other witnesses, though the devisee was one, the will came forth a valid instrument, to all intents and purposes.

Thus, if the common law rule could be adapted to the construction of this statute, it would not make the devise void, but get rid of it by payment, allowing it to be good. And, indeed, this analogy did prevail so strongly, that it grew to be a common opinion, that where a legacy only was given to a witness, though charged upon the land, a release would do the business.

Again, that the legacy was not void by the attestation, is further proved, by the last act of Parliament, (*n*) which does not confirm any former will liable to the objection, till the legacy is either paid, or tendered. Whereas the same act declares, that in all such wills, for the future, the legacy shall be void.

(*n*) 25 G. 2. c. 6.

dom of mind, of the testator. They are called in, at a critical moment, to guard and protect him. They should, therefore, be superior to every exception.

It is from hence observable, that though the legislature avoided giving any opinion upon this litigated question upon the statute of frauds, yet they declare, in the strongest manner, that the legacies so given to the witness were not void, and that it required a new law to make them void, for the future.

Let me add to this common opinion of the bar, so much relied upon, in the former part of the argument, that the legacy was so effectual to disable the witness, that nothing less than a release would enable him to prove the will for any body's benefit.

I wonder a little, why so much pains are taken in the argument to establish the practice of releasing, if the legacy was a nullity, and wanted no release ; for if this last was law, that method was not only nugatory, but unjust ; and the Parliament must be charged with the same injustice in directing so many void legacies to be paid. But if I have expounded the statute right, where a devisee is a witness, the whole will is fraudulent *ab initio,* and it cannot be otherwise.

The publication is one entire transaction ; the will is one disposition of the testator's estate to several persons ; the bequests are settled and apportioned by a comparison with each other ; and if you garble the will, by taking out particular bequests, you vary the testator's intention in the remainder, and his whole will is maimed.

In case of fraud, for the argument must always remember, that these were cases which the statute intended to prevent ; the witness gets the legacy by the merit of attesting the other bequests ; (for the grand devisee will hardly ever be a witness) and it is by the other part of the will, that the heir is generally undone ; so that the remainder of the will, which the legatee is to establish, is ten times more than that part, which is to be annulled.

Let us see how this point stands upon the cases.

*Hilliard* v. *Jennings,* is said to be an authority, and so proved in *Baugh* v. *Holloway.* (*o*) And there is an expression in *Carthew's* report of the case, that seems, in some sort, to favour the doctrine.

(*o*) Wil. Rep. 557, 558.

*Edwards*, (of New-Haven) and *Daggett*, for the defendant in error, contended, that even in the courts at Westminster, the will would be adjudged properly wit-

I have, in the former part of my argument, examined that case so fully, that it will be sufficient here to observe, that this point was neither resolved, nor argued, nor hinted at, in *Hilliard* v. *Jennings*; and it was impossible that the point could arise upon that will, which contained only one single bequest of real estate.

If that be so, as it is, it would have been a most extraordinary thing, if the Court had spontaneously taken upon themselves to settle this important point, tending to no less consequence than a virtual repeal of the statute of frauds; it would have been strange I say, to have done this, without a case, or a reason, to support it, when the point too was collateral to the question before them, and neither touched by their counsel, nor argued by themselves.

I don't wonder Sir *Robert Raymond* should argue, as it is pretended, for his fee; the bar is apt to argue in that manner; nor do I wonder the Court should, in so stale a business, send the plaintiff to law. But, I can by no means conclude, that because the case never came back, that the heir at law gave up the point. Why might it not end by compromise? I could make twenty conjectures, that should all account for the discontinuance of the cause more probably than that; but it is not worth while, because if the heir at law had really given up the point, his concession would not weigh a hair in the argument.

I have now gone through the argument, and will close with declaring, that I will take no notice of any part of the civil law learning that has been brought into this argument; Lord Chief Justice LEE did not ground his opinion upon that law; he did not argue from it; he did not rely upon its authority. I am favoured with a very correct note of his opinion from my brother ADAMS, where, after he had fully argued the case, without taking any other notice of the civil law, than to declare that *Swinburn's* law upon legacies cannot be applied to land devises, and to observe, in the same place, that both laws concur, in rejecting interested witnesses.

He concludes in these words:

" Upon the whole, *conditionem testium cum signarent, inspicere de-*

nessed. All the cases cited, in which the witnesses were deemed incompetent, are, where they received property, or were discharged from the payment of rates or taxes, or relieved from other burdens. Here, the society was merely a trustee. No fee simple was conveyed to the individuals. They received nothing by this will, which they could sell, or devise, or which could be descendible to their heirs. No part of the property could be taken for any other purpose ; nor did it appear, that the corporators were permitted to educate their children, at this school, *free of expence ;* or that it was not to be open to every body, as well as to the inhabitants of that society. The witnesses might not wish to educate their children there. They might, indeed, be biassed in favour of the will ; but they were only remotely, or contingently, interested. They cited *Townsend* v. *Row,* (*s*) *Wyndham* v. *Chetwynd,* (*t*) and *the King* v. *Prosser.* (*u*)

(*s*) 2 *Sid.* 109.      (*t*) 1 *Burr.* 421.      (*u*) 4 *Term Rep.* 17.

" *bemus ;* and, as that is to be considered as intended to prevent any " fraud being used, at a time when testators are most of all liable to " be imposed on ; and as all people have it in their power to get dis- " interested witnesses ; we think this will is not well executed, ac- " cording to the statute ; but is void, as far as it concerns lands."

This is enough to shew, that Lord Chief Justice LEE never meant to introduce the learning of the civil law into this question ; the rule is mentioned by way of ornament, not argument ; because it happened to express his own common law opinion, in a matter, where he conceived both laws concurred.

I am not wise enough to determine which of the two laws is most perfect, the Roman, or the English. This I know, (which is enough for a judge) that although almost every country in Europe hath received that body of laws, yet they have been, with a most stubborn constancy, at all times, disclaimed, and rejected, by England. For which reason, (and not through any disrespect to the argument I have been endeavouring to answer) I choose to lay aside all that learning, as not being relevant in Westminster Hall.

They urged further, that in this State, *in all cases*, the inhabitants of corporations have been admitted as good witnesses. They cited the case of *Sanford's* will, decided in 1779, where the parishioners of Amity Parish, in Woodbridge, were admitted as witnesses to prove the sanity of the testator, and that he was not under any undue influence, though the will contained a devise to said parish.

BY THE COURT,

The judgment was affirmed.

1802.

CORNWELL
*v.*
ISHAM.

1803.

SAV-
. JOHN

.ı the plain-
y virtue of a
.e nature of a

A protest is
inadmissible
evidence in
chief.

N